UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

CASE NO. 5:07-cr-19-Oc-10GRJ

MIGUEL VILLARREAL-ARCHILA
a/k/a Salomon
a/k/a El Flaco

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by A. Brian Albritton,

United States Attorney for the Middle District of Florida, and the defendant, MIGUEL

VILLARREAL-ARCHILA, a/k/a Salomon, a/k/a El Flaco, and the attorney for the

defendant, Joel Denaro, Esq., mutually agree as follows:

A.     **Particularized Terms**

1.     **Count(s) Pleading To**

The defendant shall enter a plea of guilty to Count One of the Indictment.

Count One charges the defendant with conspiracy to distribute five (5) kilograms or

more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.

2.     **Minimum and Maximum Penalties**

Count One is punishable by a mandatory minimum term of imprisonment

of ten years up to life imprisonment, a $4,000,000 fine, or both, a term of supervised

release of at least five (5) years, and a special assessment of $100.00, said special

Defendant's Initials M.V.A                                    AF Approval _____

assessment to be due on the date of sentencing.  If the defendant were to violate the terms and conditions of supervised release upon release from imprisonment, the defendant could be sentenced to an additional term of imprisonment of up to five years.

A.    3.    **Elements of the Offense(s)**

The defendant acknowledges understanding the nature and elements of the offense(s) with which defendant has been charged and to which defendant is pleading guilty.  The elements of Count One are:

| First: | That two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the Information; and |
|---|---|
| Second | That the defendant, knowing the unlawful purpose of the plan, willfully joined in it. |

In addition to these elements, in order to establish that the increased penalty provisions of 21 U.S.C. § 841(b)(1)(A) are applicable (e.g., 10 years to life imprisonment) the United States must prove that the object of the conspiracy was to distribute five (5) kilograms or more of cocaine.

4.    **Counts Dismissed**

At the time of sentencing, the remaining count against the defendant, Count Two, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5.    **Base Offense Level**

Pursuant to Fed. R. Crim. P. 11(e)(1)(B), the United States and the defendant stipulate and agree that the defendant's base offense level be calculated at level 38 pursuant to USSG §§ 2D1.1 and 1B1.3.  The defendant understands that this

Defendant's Initials  M VA

2

stipulation and agreement is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

6.   **Acceptance of Responsibility - Three Levels**

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a).  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b), the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level.  The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

7.   **Role**

The United States and the defendant agree that the defendant does not qualify for an aggravating role adjustment pursuant to U.S.S.G. § 3B1.1 or a mitigating role adjustment pursuant to U.S.S.G. § 3B1.2.  The defendant understands that this

Defendant's Initials  _M.V.A_____

agreement is not binding on the court and if not accepted by the Court the defendant will not be allowed to withdraw from the plea.

       8.    **Safety Valve**

           The defendant and the United States stipulate and agree that the defendant does not qualify for the application of the safety valve pursuant to U.S.S.G. § 5C1.2.

       9.    **Cooperation - Substantial Assistance to be Considered**

           Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such

Defendant's Initials   M.V.A

cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

The defendant agrees that his cooperation with the Colombian government pursuant to the Justice & Peace Process, Colombian Law 975 of 2005, does not qualify as substantial assistance under either U.S.S.G. §5K1.1 or Fed. R. Crim. P. 35(b).

10. **Use of Information - Section 1B1.8**

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

11. **Cooperation - Responsibilities of Parties**

a. The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating

Defendant's Initials ___M.V.A___

5

circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.      It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)      The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)      The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to

Defendant's Initials  M.V.A.

6

said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant its own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or

Defendant's Initials 

7

in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

12.   **Forfeiture**

This plea agreement is being entered into by the United States on the basis of defendant's express representation that he will make a full and complete disclosure to the Governments of the United States, Colombia, and any other country in which he has assets located, of all assets over which he exercises direct or indirect control, or in which he has any financial interest.  Defendant agrees to forfeit whatever interest he may have in assets which have, at any time, been related to drug trafficking. These assets are to include all property - including bank accounts, securities, real property, personal property, and property interest of any kind and located in the United States, Colombia, or elsewhere, which constitutes either: (1) proceeds of his involvement drug trafficking; or (2) property involved in or used to facilitate drug trafficking.

Defendant consents to any order of forfeiture or judgment either in the United States, in Colombia, or in any country, which is necessary to effect the forfeiture of property described herein, and further agrees to take all steps necessary to pass clear title to the forfeitable assets to the United States, Colombia, or any country including, but not limited to, surrendering of title, signing a consent decree, stipulating facts regarding the transfer of title and basis for the forfeiture, and signing any other documents necessary to effectuate such transfer, and cooperating in defeating third

Defendant's Initials   M.V.A

8

party "nominee" or "straw" interests in the properties.  Defendant also agrees to direct any banks which have custody of defendant's assets to deliver all funds and records of such assets to the United States.

The defendant specifically agrees to make full disclosure to the Colombian authorities concerning his assets as part of the Justice and Peace process in Colombia.  The defendant further agrees to voluntarily transfer his interest in all such disclosed assets as are permitted for use under Colombian law by the Justice and Peace Commission in Colombia, if requested, in order to provide restitution to the victims of AUC activity identified in the Justice and Peace process.  The defendant agrees to not file or interpose any claim or challenge, and to not assist others in the filing of any claims or challenges, to the transfer of any of the disclosed assets as described in this paragraph.

B.   **Standard Terms and Conditions**

1.   **Restitution, Special Assessment and Fine**

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1) (limited to offenses committed on or after April 24, 1996); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663 (limited to offenses committed on or after November 1, 1987) or §

Defendant's Initials 

3579, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  On each count to which a plea of guilty is entered, the Court shall impose a special assessment, to be payable to the Clerk's Office, United States District Court, and due on date of sentencing.  The defendant understands that this agreement imposes no limitation as to fine.

     2.    **Supervised Release**

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

     3.    **Sentencing Information**

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

Defendant's Initials  _M K A_

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit, upon execution of this plea agreement, an affidavit reflecting the defendant's financial condition.  The defendant further agrees, and by the execution of this plea agreement, authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office or any victim named in an order of restitution, or any other source, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.

4.      **Sentencing Recommendations**

It is understood by the parties that the Court is neither a party to nor bound by this agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

Defendant's Initials  M.V.A

11

5.   **Defendant's Waiver of Right to Appeal and
Right to Collaterally Challenge the Sentence**

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence or to challenge it collaterally on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by Title 18, United States Code, Section 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by Title 18, United States Code, Section 3742(a).

6.   **Middle District of Florida Agreement**

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

Defendant's Initials  M.X.A

7. **Filing of Agreement**

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

8. **Voluntariness**

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the

Defendant's Initials _MV.A_

Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

9.    **Factual Basis**

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

10.    **Entire Agreement**

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials  M.V.A

11. **Certification**

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _15th_ day of _May_____, 2009.


_____
MIGUEL VILLARREAL-ARCHILA
Defendant

A. BRIAN ALBRITTON
United States Attorney

By: _____
JULIE HACKENBERRY SAVELL
Assistant United States Attorney
Chief, Jacksonville Division


_____
JOEL DENARO
Attorney for Defendant

_____
MAC D. HEAVENER, III
Assistant United States Attorney
Deputy Chief, Jacksonville Division


Defendant's Initials _MVA_____

15

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                         Case No. 5:07-cr-19-Oc-10GRJ

MIGUEL VILLARREAL-ARCHILA
  a/k/a Salomon
  a/k/a El Flaco

## PERSONALIZATION OF ELEMENTS

*and* MVA

*the beginning of ⌀*

1.    From in or about 2002 through in or about ~~early~~ 2006, in the Middle

      District of Florida, and elsewhere, did you come to a mutual

      understanding with others to try to accomplish a common and unlawful

      plan, that is, to distribute cocaine, a Schedule II controlled substance, the

      amount of cocaine being five (5) kilograms or more, as charged in the

      Indictment?

2.    Did you, knowing the unlawful purpose of the plan, willfully join in it?

Defendant's Initials ___M.V.A_____

16

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 5:07-cr-19-Oc-10GRJ

MIGUEL VILLARREAL-ARCHILA
  a/k/a Saloman
  a/k/a El Flaco

AND
the beginning
of O

**FACTUAL BASIS**[1]

Between 2002 and ~~early~~ 2006, Miguel Villarreal-Archila, a/k/a Salomon, a/k/a el Flaco, a

Colombian citizen, supplied large quantities of cocaine to a number of cocaine traffickers in

Colombia, including Amilcar Barros-Gomez. The cocaine was transported from Colombia or

Venezuela to Haiti, Dominican Republic, Mexico and other countries where it was sold to others

who imported the cocaine into the United States for ultimate distribution. Amilcar Barros-

Gomez sold much of the cocaine he received from Villarreal-Archila to Haitian traffickers, or

other Colombian Traffickers residing in Haiti, like Carlos Ovalle, who then sent the cocaine to

the United States for distribution.

Villarreal-Archila's associate Manuel Enrique Torregrosa-Castro, a/k/a Chang, worked

with Villarreal-Archilla and Barros-Gomez to arrange transportation of the cocaine loads from

stash locations controlled by Villareal-Archila and Torregrosa-Castro in Colombia to close

associates of Barros-Gomez based out of Barranquilla, Colombia, including Nelson Barros and

---

1

The factual basis is prepared by the United States and does not necessarily
include all of the facts relevant to the defendant's involvement in the crime to which he
is pleading guilty and other illegal drug activities in which he may have been involved.
Defendant's Initials  M.V.A.

Jhon Alexander Posada-Vergara. Once in possession of the cocaine loads, Barros-Gomez and his associates in Colombia would then make arrangements to have the cocaine transported to their initial destination countries via large cargo vessels. Some of these cargo vessels, to include the M/V Destinee, the M/V Capitan L, and the M/V Kitziana, were owned by Barros-Gomez and/or Carlos Ovalle. On other occasions, their associate Hector Fabio Garcia Vengohechea, a/k/a La Gatia, coordinated the transportation of the shipments of cocaine with other members of the organization from Colombia to Haiti, inside large commercial vessels that transported legitimate goods to those countries, including the M/V Sagala. In addition, these same vessels were utilized by Barros-Gomez to transport some of the drug proceeds back to Colombia to pay Villareal-Archila and Torregrosa-Castro for the cocaine supplied to Barros-Gomez on credit.

Beginning in 2000, two cooperating individuals, working at the direction of the Drug Enforcement Administration, arranged to launder drug proceeds of Carlos Ovalle and his associates. The arrangements were made through telephone contact between the cooperating individuals and undercover DEA Task Force Agents (TFA) with, among other individuals, Carlos Ovalle and Ricardo Pierre. The majority of the telephone calls were received by the undercover agents and the cooperating individuals in Lake County, Florida, thus providing venue in the Middle District of Florida, Ocala Division. Three money pickups were conducted in Miami, Florida which totaled over $2 million in drug proceeds. A fourth money pickup led to the seizure of $500,000 from Ricardo Pierre.

Between December 2000 and June 2002, a cooperating individual and undercover agents had numerous conversations with Ovalle and Pierre, during which Ovalle and Pierre attempted to employ the services of undercover agents, posing as captains of a sea-going vessel, to transport

Defendant's Initials __M.V.A.__          2

300 kilograms of cocaine from Haiti to Central Florida for distribution. The transaction did not take place because Ovalle had trouble moving the cocaine to North Haiti where it was to be picked up by the undercover vessel. Ovalle continued to have conversations with the undercover agents and the cooperating individuals in 2002 during which Ovalle indicated he could provide them with 100 kilograms of cocaine twice a month. Ovalle also sought to transport 400 kilograms of cocaine to central Florida via the undercover agent's vessel.

In June 2002, a confidential informant working for DEA traveled to Haiti and met with Ovalle during which Ovalle provided the confidential informant with radio frequencies to facilitate communications during the planned smuggling venture and coordinates for the delivery of the cocaine load. The confidential informant and crew left Florida destined for the north coast of Haiti to receive delivery of cocaine from Ovalle and his associates. During the trip, Ovalle maintained communications with the confidential informant and ultimately communicated that he was having problems moving the load of cocaine to Cap Haitian. The cocaine transaction never took place. However, Ovalle maintained contact with the cooperating individuals through May 2003 and continued to try to arrange for the transportation of a load of cocaine from Haiti into the United States.

From late 2002 through August 2003, when Ovalle was arrested, Villarreal-Archila supplied Barros-Gomez with over 500 kilograms of cocaine which were transported from Colombia to Haiti in large vessels.   In 2002, Ovalle purchased two vessels to transport cocaine. On one occasion, Villarreal-Archilla supplied Barros-Gomez with 94 kilograms of cocaine which Barros-Gomez sent from Colombia to Haiti aboard Ovalle's vessel, the M/V Kitziana, as a test run. Once successful, Barros-Gomez obtained an additional 300 kilograms of cocaine from

Defendant's Initials  M∤VA          3

Villarreal-Archila, as well as additional cocaine from another source, and smuggled it to Ovalle in Haiti aboard the M/V Kitziana. Once in Haiti, Ovalle and Barros-Gomez sold the cocaine to Haitian traffickers who then sent the cocaine to the United States. Thereafter, Ovalle and Barros-Gomez made arrangements for payment of the cocaine to be picked up in Florida.

Additionally, Torregrosa Castro owned two vehicles equipped with hidden compartments capable of concealing 100 kilograms of cocaine, which he utilized to transport Barros-Gomez' cocaine loads. Garcia Vengohechea worked for several maritime shipping companies in Colombia and utilized his position of employment to arrange for loads of cocaine to be taken aboard commercial vessels carrying legitimate cargo, concealed, and ultimately transported and smuggled out of Colombia. Barros-Gomez utilized the services of Garcia-Vengohechea when Barros-Gomez was supplied cocaine loads by Villarreal-Archila. Garcia-Vengohechea facilitated the shipment of cocaine among various vessels including the M/V Sagala, which could accommodate 50-350 kilograms of cocaine, from Colombia to Ovalle and others in Haiti through 2005. The sailors, who were known to Garcia-Vengohechea, would transport the proceeds from the sale of Barros-Gomez' cocaine back from Haiti to Garcia-Vengohechea in Colombia.

Ovalle was arrested in August 2003 and law enforcement officers seized, among other items, a cellular phone which had in the phone book telephone numbers for Amilcar Barros-Gomez and others. Various drug ledgers were also seized that noted several million dollars attributed to Barros-Gomez for shipments of cocaine supplied by Barros-Gomez to Ovalle as well as hundreds of kilogram amounts of cocaine attributed to Barros-Gomez. Barros-Gomez supplied Ovalle with over 20,000 kilograms of cocaine between 1998 and Ovalle's arrest in August 2003.

Defendant's Initials  M(H)          4

After Ovalle's arrest, Barros-Gomez continued to be supplied with hundreds of kilograms of cocaine by Villarreal-Archila and Torregrosa-Castro which Barros Gomez smuggled to Haiti utilizing the services of Garcia-Vengohechea and various commercial vessels, as well as on one occasion utilizing his own cargo vessel, the M/V Destinee.

Throughout that time frame, Barros-Gomez began having problems repaying Villareal-Archila and Torregrosa-Castro for cocaine shipments supplied to him on credit. During some of the arguments over the unpaid drug debts, Villareal-Archila made threats which caused Barros-Gomez to relocate his family out of Colombia for their safety.

In December 2004, judicial wiretaps were initiated on cellular telephones belonging to Amilcar Barros-Gomez's brother, Nelson Barros, and others. The wiretap revealed conversations involving Nelson Barros, Amilcar Barros-Gomez and others discussing various vessels to be used to ship cocaine. Additionally, search warrants were executed on Barros-Gomez's e-mail account between late 2004 and early 2005. A review of the e-mail messages and wiretaps showed that in mid 2005, Barros-Gomez intended to use the M/V Sea Atlantic to transport cocaine. In August 2005, the M/V Sea Atlantic met with a go fast vessel off the northern coast of Colombia and received a load of cocaine. The M/V Sea Atlantic was later seized in international waters and a search of the vessel revealed approximately 2040 kilograms of cocaine.

Throughout 2005, agents continued wire intercepts over cellular telephone utilized by Barros-Gomez in the Dominican Republic, as well as phones utilized by Nelson Barros in Colombia. In late 2005, agents intercepted calls between Barros-Gomez, Nelson Barros, and Garcia Vengohechea in which arrangements were being

Defendant's Initials _M.V.A_          5

made to send another cocaine shipment to Haiti using the M/V Sagala. However, other intercepted calls showed that Barros-Gomez owed Garcia-Vengohechea a large sum of currency for services rendered during a recent cocaine smuggling venture, which was supplied to Barros-Gomez by Villarreal-Archila and Torregrosa-Castro. During intercepted calls, Garcia-Vengohechea arranged for a crew member of the M/V Pollux, due to arrive at the Dominican Republic, to meet with Barros-Gomez to collect a large sum of currency and smuggle it back to Colombia on the M/V Pollux. Further wire intercepts showed that the M/V Pollux arrived at the Dominican Republic and that a crew member met with Barros-Gomez and collected a large sum of currency. Based on the information, DEA Orlando caused the vessel to be boarded by U. S. Coast Guard as the M/V Pollux approached Colombian waters. During the search of the vessel, $50,000 in U.S. Currency was seized from one of the crew members. The crew member told officials that he picked up the currency from Barros-Gomez at the direction of Garcia-Vengohechea. These facts were also corroborated by intercepted calls between Barros-Gomez, Nelson Barros and Garcia-Vengohechea post seizure.

Intercepted conversations revealed that Barros-Gomez acquired ownership of M/V Maria Carolina and in early 2006, Barros-Gomez utilized the vessel to transport a large sum of U.S. currency from the Dominican Republic to Cartagena, Colombia. Although some of the money was spent by Barros-Gomez to make repairs and construct a hidden compartment on the M/V Maria Carolina for future cocaine smuggling trips, the rest of the money was used make partial payment to Villarreal-Archila for a 549 kilogram load of cocaine.

Defendant's Initials _K.V.A_               6

Additionally, wire intercepts were initiated in Colombia on a telephone utilized by Garcia-Vengohechea which showed that Garcia-Vengohechea was in constant communication with Barros-Gomez, Nelson Barros and Jhon Alexander Posada-Vergara arranging for the transportation of cocaine shipments from Colombia to Haiti. In addition, intercepted calls showed that Garcia-Vengohechea was coordinating the loading of the cocaine loads owned by Barros-Gomez and other Colombian drug traffickers with crew members aboard the M/V Sagala for its transportation to Haiti. These intercepted calls also showed that Garcia-Vengohechea had coordinated with a crew member aboard the M/V Pollux, destined to stop at the Dominican Republic, to meet directly with Barros-Gomez and collect a large sum of U.S. currency owed to Garcia-Vengohechea by Barros-Gomez for a previous cocaine smuggling trip.  Based upon these intercepted calls, the United States Coast Guard stopped the M/V Pollux. The United States Coast Guard seized $50,000 in U.S. Currency from the crew member that had met with Barros-Gomez in the Dominican Republic.

Barros-Gomez was arrested in 2006 in Santo Domingo, Dominican Republic.   In 2007, Villareal-Archila, Torregrosa-Castro and Garcia-Vengohechea were arrested in Colombia.

Defendant's Initials  M\/K·                  7