UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

OCALA DIVISION

CASE NO.: 07-CR-19-Oc-10GRJ

UNITED STATES OF AMERICA,

   *Plaintiff,*

vs.

MIGUEL VILLARREAL-ARCHILA,

   *Defendant.*

                                            /

**MOTION FOR DOWNWARD DEPARTURE OR, IN THE
ALTERNATIVE, IMPOSITION OF A NON-GUIDELINE SENTENCE**

The Defendant, MIGUEL VILLARREAL–ARCHILA, files this his Motion for Downward Departure or in the Alternative Imposition of a Non-Guideline Sentence and in support thereof states the following:

## PROCEDURAL HISTORY

1) Miguel Villarreal-Archila and other individuals were charged in a two-count indictment returned by a grand jury for the Middle District of Florida, Ocala Division, on May 3, 2007. Count I charges that from 2002 through April 2007 in the Middle District of Florida and elsewhere the defendants conspired to distribute five (5) or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Count II charges that during the same time frame the defendants conspired to import five (5) or more kilograms of cocaine in violation of 21 U.S.C. § 963. At the time the indictment was returned, Mr. Villarreal-Archila was residing outside of the United States.

2) Mr. Villarreal-Archila was subsequently arrested in Colombia on May 3, 2007. He remained in custody in Colombia at a maximum security penal institution known as Combita until September 2, 2008, when he was transported to the United States. Since that date he has remained in custody at the Lake County Jail in Tavares, Florida.

3) On May 15, 2009, Mr. Villarreal-Archila pled guilty to Count I of the Indictment before United States Magistrate Judge Gary R. Jones. On June 19, 2009, this Court accepted Mr. Villarreal-Archila guilty plea and adjudicated him guilty as to Count I. He now awaits sentencing.

## THE PRESENTENCE INVESTIGATION REPORT

### A. The Guideline Calculations

The Presentence Investigation Report (PSI) prepared in this case reflects the following guideline calculations:

| | |
|---|---|
| Base Offense Level: (more than 150 kilograms of cocaine) | 38 |
| Adjusted Offense Level: | 38 |
| Adjustment for Acceptance of Responsibility, USSG §3E1.1(a) | -2 |
| Reduction pursuant to USSG §3E1.1(b) | -1 |
| Total Offense Level | <u>35</u> |

According to the PSI the foregoing calculations coupled with a criminal history category of I, yield a guideline range from 168 months (14 years) to 210 months (17 ½ years).

### B. Identified Factors that May Warrant Departure

The PSI has identified two factors which may warrant a departure. First, in Paragraph 76 the Report indicates that the government has suggested that Mr. Villarreal-Archila may be eligible for a downward departure based upon substantial assistance to authorities under United States Sentencing Guideline § 5K1.1. Second, in Paragraph 77, the report identifies as a basis

for downward departure extraordinarily harsh conditions in which the defendant was previously held in custody in Colombia and specifically provides:

> Pursuant to the "Grounds for Departure(Policy Statement)", the sentencing court may depart from the applicable guidelines range if there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission formulating the guidelines that, in order to advance the objectives of 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described.  In this case, in consideration of the extraordinarily harsh conditions in which the defendant was held in Colombia prior to his being transferred to the United States for prosecution, a downward departure may be warranted.  USSG § 5K2.0. [1]

**CONDITIONS OF CONFINEMENT AT THE COLOMBIAN MAXIMUM SECURITY PRISON KNOWN AS "COMBITA"**

As indicated in the presentence report, there appears to be no evidence to indicate that the Sentencing Commission took the conditions of foreign confinement into account in creating the Guidelines.  The facts regarding Combita clearly warrant departure consideration. Combita is a maximum security type prison located in the mountains north of Bogota and sits at an altitude approximately 11,000 feet.  The conditions that an inmate is subjected to at Combita have been reported to be unusually harsh and inhumane because of the extreme climate conditions and the deprivation of basic human needs and legal rights.  For example, an inmate at Combita will receive no medication unless it is donated by a fellow inmate; he is often forced to sleep on a concrete slab without bedding; and on those occasions when mattresses are available they and the bedding are filled with mildew; he is forced to use bathroom facilities that either do not work

---

[1] Paragraph 28 of the PSI reflects that this topic was discussed with the probation officer during the course of his interview of Mr. Villarreal-Archila.

or are filth-ridden and smell horribly; and there is insufficient water pressure to reach the showers. Moreover, dining facilities are not sufficiently separated from the toilets. Lastly, shaving implements (razors/shavers) have to be shared. This creates a very hazardous condition because of the fungus and bacteria which is readily transmitted and infects the inmate population.

The weather in the mountains where Combita is located is often bitter cold and the inmates are not provided sufficient clothing to protect them from the freezing weather. The water that they are provided for drinking and cooking is often polluted with pesticides, fertilizer, and animal feces. Those individuals awaiting extradition to the United States are given the opportunity to bathe only in freezing water at 5:00 a.m.[2]

The United States State Department has found Colombia's prison system overcrowded and poorly funded and staffed with undertrained and corrupt officials and employees. *See*, e.g., Country Reports and Human Rights Practices-2005 U.S. Department of State, Bureau of Democracy, Human Rights, and Labor (March 8, 2006).[3]

---

[2] The above described conditions are documented in a report authored by Prosecutor's General Office in Colombia. A copy of that report is attached hereto as Exhibit A.

[3] Below is an excerpt from the State Department Report:

> The National Prison Institute (INPEC) runs the country's [Colombia's] 139 national prisons and is responsible for inspecting municipal jails. Although part of the Ministry of Interior and Justice, INPEC has an independent budget and administrative decentralization. With the exception of new facilities, prison conditions were poor, particularly for prisoners without significant outside support. Many of INPEC's 8,757 prison guards and administrative staff were poorly trained or corrupt. Overcrowding, insecurity, corruption, and an insufficient budget continued to be serious problems. As of March there were more than 69 thousand prisoners held in spaces designed to accommodate fewer than 50 thousand, an overcrowding rate of nearly 40 percent. In 13 institutions overcrowding exceeded 100 percent, and in Bucaramanga's penitentiary, where more than 2 thousand prisoners lived in a space designed for 664, the rate surpassed 200 percent. INPEC representatives estimated that nine thousand

Combita has also been singled out for criticism in a variety of human rights reports because of the consistent deprivation of human needs, lack of medical attention, lack of funding that has resulted in water rationing for inmates, and other problems. *See*, e.g., Amnesty International, Amnesty International's Briefing to the U.N. Committee Against Torture on the Republic of Colombia (2003) (http://web.amnesty.org/library/print/engamr230662003). The Amnesty International report documents that Combita inmates "have been left exposed for long periods of time to the sun and rain," and are forced to "shower in the open air and left outside for periods of about an hour without being able to dry themselves or dress," and have "reportedly been given rotten food or food which appears to have been contaminated." *Id*.

## DECISIONAL AUTHORITY SUPPORTS THE REQUESTED DOWNWARD DEPARTURE/NON-GUIDELINE SENTENCE

The Eleventh Circuit has decided that, "conditions of pre-sentence confinement could, in an appropriate case, support a downward departure." *United States v. Pressley*, 345 F.3d 1205,

---

> guards would be needed to provide adequate security. The Committee in Solidarity with Political Prisoners (CSPP) noted a decrease in corruption resulting from improved training, increased supervision, and more accountability for prison guards.
>
> Budget problems affected prisons in many ways. At Combita Prison lack of money to pay sanitation fees led to water rationing. During the year INPEC spent approximately $2 (4,990 pesos) per day on each inmate for food. Private sources continued to supplement many prisoners' food. CSPP reported that the doctor to patient ratio was as low as 1 to 1,200 in some institutions and noted that INPEC failed to negotiate a nationwide healthcare contract for all its facilities.
>
> Authorities sometimes failed to prevent deadly violence among inmates. INPEC reported that from January to June, there were 20 violent deaths among inmates related to fighting and riots. In March a fight between inmates at Villahermosa jail in Cali resulted in two deaths. During this period there were 56 escapes, including 44 because of security failures and 1 with the aid of outside assistance.

*Id*.

1218 (11th Cir. 2003).[4] Relying on *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (*per curiam*), the Eleventh Circuit stated:

> The district court was correct in holding that conditions of confinement could provide a basis for departure, since this factor was apparently not taken into account by the Sentencing Commission and could be unusual enough to take a case out of the heartland of the applicable guidelines.

*Pressley*, 345 F.3d at 1218.[5] The departure authority recognized by the Eleventh Circuit in *United States v. Pressley*, and *United States v. Carty* had previously been acknowledged in opinions from other Circuit Courts of Appeals and United States District Courts. *See*, e.g., *U.S. v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998) (noting that the district court granted a downward departure from 151 months to 121 months based on conditions of confinement in a non-federal facility where the defendant was held for approximately two and a half (2½) months, but declining to decide if that was an abuse of discretion)); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1996) (recognizing that the district court granted a downward departure of three (3) levels based upon defendant's 22-month presentence incarceration in a state facility that was harsher incarceration than what he would have been subjected to federally); *United*

---

[4] Prior to the Eleventh Circuit's decision in *Pressley*, the authority for a district court to downwardly depart from the guidelines based upon presentence conditions of confinement was tacitly recognized in *United States v. Sanchez,* 242 F.3d 1294, *rehearing en banc granted*, *opinion vacated*, 247 F.3d 1306, *on rehearing en banc*, 269 F.3d 1250 (11th Cir. 2001).

[5] The *Pressley* court was confronted with a situation where the defendant had spent five (5) of his six (6) years of presentence confinement in USP Atlanta where he was subjected to a 23-hour a day lock down. The court noted that those facts were extraordinary both in the length of presentence confinement and in conditions of confinement and could not say that they were insufficient as a matter of law to support the two and a half (2½) year downward departure which the district court said it would consider appropriate if it had the power to depart. 345 F.3d at 1219. Similarly the court in *Carty* held that the district court could consider presentence conditions of confinement which the defendant endured while in the Dominican Republic. These included him being held in a four by eight (4x8) foot cell with three (3) or four (4) other inmates; no lighting in the cell; being permitted outside of his cell for only 10 to 15 minutes per day to bathe; a limit of one (1) phone call per week; no running water in the cell; and the only toilet facilities consisted of a hole in the ground.

States v. Sutton*, 973 F.Supp. 488, 492 (D.N.J. 1997) (recognizing discretion to downwardly depart based upon conditions of pretrial confinement); *United States v. Francis*, 129 F.Supp.2d 612 (S.D.N.Y. 2001) (downward departure based upon substandard conditions of pretrial confinement in state correctional facility).

## COMBITA IN THE COURTS

The extraordinarily harsh conditions of confinement at the Combita prison in Colombia have recently been raised as grounds for downward departure in at least two cases. In *United States v. Fajardo*, 2006 W.L. 3498640 (S.D.N.Y. 2006), the defendant urged the court that the conditions of his presentence confinement at Combita should be taken into account in determining his sentence. The *Fajardo* court was apprized of a number of problems at Combita including the fact that there was no hot water for the prisoners; that they were forced to bathe outdoors and that the barred windows of the cells were continually open to the cold mountain air, with Combita located more than two miles above sea level. The court also took note of the fact that both the U.S. State Department and Amnesty International have documented the harsh and inhumane conditions at Combita (Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State Colombia; Country Reports of Human Rights Practices-2005 (2006) and Amnesty Int'l, Amnesty International's Briefing to the U.N. Committee Against Torture on the Republic of Colombia (2003)). In light of the foregoing, the court acknowledged that it would consider the conditions of presentence detention in Combita and imposed a minimum mandatory imprisonment term of ten (10) years required under Title 21, United States Code, Sections 841(b)(1)(A) and 846. The *Fajardo* court noted that the statutorily mandated minimum mandatory 10 year sentence precluded more lenient treatment.

In *United States v. Torres*, 2005 WL 2087818 (S.D.N.Y 2005), the court was faced with a request for a downward departure by an individual who spent five (5) of his thirteen (13) months

7

of incarceration in Colombia at the Combita prison. During the course of the sentencing hearing, the court reviewed the United States Department of State's 2003 Country Reports on Human Rights Practices (Bureau of Democracy, Human Rights, and Labor, Feb. 25, 2004) which spoke to the harsh conditions and extant at Combita. In addition, the court considered evidence presented to it that inmates were housed in cells made of concrete whose windows were only barred; that because of its location at high altitudes in a windy area temperatures at night routinely went into the 40's; that there was no heating in the cells; that the inmates do not have hot water; that the inmates were required to leave their cells at 5:00 a.m. and could not return until 5:00 p.m. and that in between those hours they were confined (except for occasional visits to outside athletic fields) to an enclosed, but not fully roofed area even on the coldest and rainiest of days. Based upon those factors the court decided to downwardly depart in imposing sentence.[6]

## SECTION 3553(a) FACTORS

As the Supreme Court has fully explained since its decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), while sentencing courts must employ the guidelines as "the starting point and the initial benchmark," *Gall v. United States*, 128 S.Ct. 586, 596 (2007), district courts are not required to impose a sentence within the guidelines and must exercise their own independent discretion in applying the statutory factors that now govern the imposition of sentence, notwithstanding the guideline analysis. *Id.* at 594. Thus, while the Guidelines are to

---

[6] Multiple judges within the Southern District of Florida and elsewhere have granted downward departure motions premised upon conditions of confinement within the United States. In addition to the above two cases another district court recently recognized the propriety of a downward departure based on deplorable presentence conditions of incarceration in a foreign jail. In *United States v. Salvador*, 2006 WL 2034637 (S.D.N.Y. 2006), the defendant spent slightly less than five (5) months incarcerated in the Dominican Republic awaiting extradition to the United States. The court granted a one (1) level downward departure from his otherwise applicable guideline range based upon the finding that he was held in a facility that was almost devoid of even minimal sanitary conditions and often had to endure a lack of appropriate food.

be respectfully considered, they are one factor among the 18 U.S.C. § 3553(a) factors to be taken into account in arriving at an appropriate sentence. *See Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007); *Spears v. United States*, 129 S.Ct. 840, 842 (2009) (explaining that all of the sentencing guidelines "'are advisory only'") (quoting *Kimbrough*, 128 S.Ct. at 560).

Most recently, the Supreme Court reiterated these sentencing standards and further explained: "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S.Ct. 890, 892 (2009) (*per curiam*) (emphasis in original). The Sentencing Reform Act "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 128 S.Ct. at 570 (quoting 18 U.S.C. § 3553(a)).

In the present case, for reasons, supported by the decisions of other district and appellate courts in other comparable cases, the guidelines here call for a sentence that is unnecessarily high and thus, even apart from departure authority recognized by the courts, a variance from the guideline range is warranted under the statute based on the extreme prior conditions of foreign confinement to which the defendant was subjected in Combita for 16 months during 2007 and 2008.[7]

## CONCLUSION

For the reasons stated in this memorandum, and identified as authorized grounds for departure in the presentence report, Defendant Miguel Villarreal-Archila requests that the Court

---

[7] Notably, the defendant's federal imprisonment will be adversely affected by his citizenship status. The PSI reflects that Mr. Villareal-Archila was paroled into the United States for the purposes of being prosecuted in this case and that an immigration detainer has been filed and he is subject to deportation after he has finished serving his sentence. His federal incarceration will thus be harsher and his post-sentence incarceration will be extended while he is placed in collateral deportation proceedings. In addition, he will be required to serve his sentence at a higher security level institution than a citizen; and unlike a U.S. citizen, he is ineligible for camp or halfway house placement or furloughs as he nears conclusion of his sentence.

depart downward from the sentencing guideline range or, alternatively, vary downwardly from that range to reflect the prior harsh conditions of confinement suffered by the defendant as well based on additional grounds for imposition of a lesser sentence to be further expressed at sentencing.

Respectfully Submitted,

By: /s/Joel M. Denaro
Joel M. Denaro
Fla. Bar No. 0164460
Joel M. Denaro, P.A.
777 Brickell Avenue, Suite 400
Miami, FL 33131
Tel: (305) 371-1883
Fax: (305) 577-8376
joeldenaro@hotmail.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 15, 2009, a correct copy of this Notice of Unavailability was filed with the CM/ECF electronic filing system, and served on all appropriate parties through that system.

                                                /s/ Joel Denaro
                                                Joel M. Denaro
                                                Fla. Bar No. 0164460